UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF GEORGIA
SAVANNAH DIVISION

| | |
|---|---|
| AATU, LLC, <br> CSTS HEALTHCARE SOLUTIONS, LLC, <br> SHANE SILVER, D.C., <br> JASON MARUCCI, D.C., <br> BRETT GREENWALD, D.C. & <br> PRECISION SPINE & JOINT, LLC <br><br> Plaintiffs, <br><br> v. <br><br> JARED BROWN, D.C., and <br> JORDAN KUPPINGER <br><br> Defendants. | Civil Action No. _4:25-cv-33__ <br><br> JURY TRIAL DEMANDED |

## COMPLAINT

Plaintiffs AATU, LLC ("AATU"), CSTS Healthcare Solutions, LLC ("CSTS"), Shane Silver, D.C., Jason Marucci, D.C., Brett Greenwald, D.C., and Precision Spine and Joint, LLC ("Precision") (collectively, "Plaintiffs") file this Complaint against Jared Brown, D.C. and Jordan Kuppinger, M.D., Plaintiffs' former business partners, stating as follows:

## PARTIES

1. Plaintiff Shane Silver, D.C., is a Doctor of Chiropractic and Florida citizen.

2. Plaintiff Jason Marucci, D.C., is a Doctor of Chiropractic and Florida citizen.

3. Plaintiff Brett Greenwald, D.C., is a Doctor of Chiropractic and Florida citizen.

4. Plaintiff AATU, LLC is a Florida limited liability company. Its members are Dr. Marucci and Dr. Greenwald, both of whom are Florida citizens.

5. Plaintiffs CSTS Healthcare, LLC is a Florida limited liability company. Its sole member is Dr. Silver, who is a Florida citizen.

1

6. Plaintiff Precision Spine and Joint LLC is a Georgia limited liability company. Its current members are Jason Marucci, D.C., Shane Silver, D.C., and Brett Greenwald, all of whom are citizens of Florida.

7. Defendant Jared Brown, D.C., is a Doctor of Chiropractic and, upon information and belief, a Georgia citizen.

8. Defendant Jordan Kuppinger, M.D. is a doctor specializing in Interventional Pain Management and, upon information and belief, a Georgia citizen.

## JURISDICTION & VENUE

9. This Court has subject matter jurisdiction over this matter pursuant to 28 U.S.C. § 1332.

10. Venue is proper in this Court pursuant to 28 U.SC. § 1391 because Defendant Brown resides in this District and a substantial part of the events giving rise to this action occurred in this District.

## STATEMENT OF FACTS

*Formation of Precision Spine & Joint – A Multidisciplinary Practice*

11. As far back as 2018, Drs. Greenwald and Marucci have been involved in a multispecialty medical practice in Savannah.

12. The Savannah Orthopaedic & Spine Institute, LLC (SOSI), was founded by Dr. Padula. It was a multispecialty practice servicing the Savannah area.

13. SOSI was a Georgia limited liability company owned by Dr. Padula. It was managed by Dr. Marucci and Dr. Greenwald.

14. Drs. Greenwald and Marucci managed SOSI since its inception until Dr. Padula stopped doing new business in Savannah. After Dr. Padula disbanded SOSI, Drs. Marucci and

Greenwald continued to manage the affairs of SOSI by collecting and distributing the company's existing accounts receivable.

15. In spring 2020, after Dr. Padula ceased doing business through SOSI, Drs. Greenwald and Marucci partnered with Dr. Brown to create a new entity – Precision Spine and Joint LLC ("Precision").

16. Precision was a multispecialty group practice. It retained former SOSI providers and brought in providers of different specialties, including Dr. Brown.

17. At the time, Dr. Brown practiced a single specialty – chiropractic – through his company Coastal Empire Chiropractic, Inc. d/b/a Bright Life Chiropractic ("Bright Life").

18. Dr. Brown was given a 40% stake in Precision.

19. Dr. Brown's large percentage ownership was predicated on an agreement that Dr. Brown would give Drs. Marucci and Greenwald a percentage ownership in Brown's practice, Bright Life.

20. Dr. Brown never fulfilled that promise yet maintained his 40% ownership in Precision.

21. Dr. Brown had no prior experience managing or operating a medical practice involving interventional paid, neurology, orthopedic surgery, or spine surgery.

22. Dr. Brown's knowledge of medical coding, billing, and general management of medical professionals was virtually non-existent. He relied exclusively on the expertise of Drs. Greenwald, Marucci to establish and operate a multidisciplinary medical practice.

23. Precision inherited the location, supplies, equipment, and personnel from SOSI and took over care of SOSI's preexisting patients.

24. Dr. Brown benefited tremendously from being a member of Precision. Dr. Brown's association with Drs. Marucci and Greenwald, through Precision, allowed him to elevate his chiropractic practice, expand his professional practice, and learn the intricacies of managing a multispecialty medical practice.

25. On September 13, 2021, Dr. Silver joined Precision.

26. Drs. Marucci and Greenwald each sold a 5% ownership interest in Precision to Dr. Silver. After Dr. Silver joined Precision, Dr. Brown maintained a 40% ownership interest in Precision, Drs. Marucci and Silver each owned 25%, and Dr. Silver owned the remaining 10%.

27. Precision spent significant resources training Dr. Brown and connecting him to an extensive network of referral sources for new patients.

28. Specifically, in November 2021, Precision spent $8,000 for Dr. Brown to attend a traumatic brain injury training course conducted by the Personal Injury Institute.

29. The Personal Injury Institute works with medical doctors, chiropractors and other healthcare providers to provide not only technical training on treating patient's personal injury claims, but also training on "how to build a practice from a series of single referrals to a steady stream by acquiring the necessary record keeping, documentation and collaborative skills."[1] The Personal Injury Institute also specifically acknowledges that "relationships are built on trust, success and value," and "educating yourself on how to strategize, plan, and execute . . . [a] referral marketing campaign will be the conduit in bringing in new patients to your office."[2]

---

[1] https://www.personalinjuryinstitute.com/what-we-do/ (last accessed February 14, 2025).
[2] *Id.*

***Introduction of Dr. Jordan Kuppinger and Formation of KBS Savannah***

30. After Precision dedicated significant resources training Dr. Brown and helping him build a thriving practice with consistent referral sources, Dr. Brown sought to add another owner to Precision.

31. Dr. Brown introduced Drs. Greenwald, Marucci, and Silver to Dr. Kuppinger, an International Pain Management specialist, and he suggested that Dr. Kuppinger join Precision's practice.

32. Drs. Marucci, Greenwald, and Silver had significant reservations with Dr. Kuppinger joining the practice due to concerns about potential conflicts of interest and competition in the market.

33. Specifically, a former partner of Dr. Kuppinger disclosed to Dr. Marucci that Dr. Kuppinger had a volatile personality and warned against doing business with him.

34. In another instance, a spine surgeon in Tampa, Florida had brought Dr. Kuppinger into his practice as a pain manager, only to have Kuppinger align with another partner in the practice to change the locks to the building and cut the surgeon out of the practice altogether.

35. Dr. Kuppinger also disclosed to Drs. Marucci, Greenwald, and Silver that he involved in contentions litigation with a former practice, Coastal Spine & Pain.

36. Despite these concerns, Dr. Brown and Dr. Kuppinger assured Drs. Marucci, Greenwald, and Silver that their concerns were non-issues and that Dr. Kuppinger was always the victim of business relationships gone wrong.

37. From May 2022 to October 2022, Kuppinger worked for Precision on a trial basis, which served as an introductory and evaluation period to assess his suitability for the practice.

38. Although Drs. Marucci, Greenwald, and Silver were hesitant to add Kuppinger to the practice due to concerns about potential conflicts of interest and competition in the market, both Kuppinger and Brown made assurances that the transition would be smooth and that they were committed to maintaining the integrity of the partnership.

39. Dr. Brown specifically emphasized his personal relationship with Dr. Kuppinger, often referring to their relationship as a "big brother/little brother" relationship. He repeatedly stated he trusted Dr. Kuppinger, that Dr. Kuppinger was "his guy," and that Dr. Kuppinger could be trusted.

40. Based on these representations and assurances, the parties restructured Precision and formed a new LLC called KBS Savannah LLC d/b/a Medicus Spine & Joint. ("KBS Savannah").

41. KBS Savannah was formed on October 12, 2022, and was governed by an Operating Agreement fully executed on October 14, 2022. A true and correct copy of the Operating Agreement, signed via DocuSign, is attached as Exhibit 1.

42. Per the terms of the Operating Agreement, the members of KBS Savannah were Dr. Brown, Dr. Kuppinger, and CSTS Healthcare Solutions, a single-member LLC owned by Dr. Silver.

43. AATU, a Florida LLC owned 50/50 by Drs. Greenwald and Marucci, was designated the manager of KBS Savannah.

44. Brown, Kuppinger, CSTS, and AATU are parties to the Operating Agreement.

45. The purpose of KBS Savannah was the operate a multidisciplinary medical practice in Savannah, Georgia.

46. The proprietary and confidential business methods and practices of running a multispecialty practice were specifically recognized by the parties to the Operating Agreement.

47. Section 9.1 of the Operating Agreement provides:

> Each party acknowledges that through its relationship with [KBS Savannah] each party will: (i0 learn and understand certain valuable confidential business information and business relationships of [KBS Savannah], including [KBS Savannah's] Confidential Information; (ii) benefit from [KBS Savannah's] goodwill associated with its ongoing operations, geographic location and marketing; and (iii) learn and benefit from [KBS Savannah's] other legitimate business interests. Each party acknowledges that this information and relationships, if used improperly, could cause serious detrimental harm to [KBS Savannah].

*Exhibit 1* at 19.

48. Recognizing the importance of protecting the confidential business practices, relationships, and goodwill of KBS Savannah, the parties agreed to the following Non-Compete provision:

> For so long as a party owns any Units or Sharing Ratio, and for a period of two (2) years thereafter (the "Restrictive Period"), each party shall not, directly or indirectly, provide any services or enter into, engage in, be employed by or consult with any business that concurrently engages in a multispecialty medical practice consisting in any two (2) or more of the following specialties: chiropractic, interventional pain, orthopedic, orthopedic surgery, neurology and neurosurgery (the "Competitive Practices"), with the Restricted Area . . . [which] shall mean Chatham County, Georgia. Nothing herein shall prevent a party from practicing a single specialty of Competitive Practices; it is in the intent of the parties that the restrictive covenant will only appl to a joint practice consisting of at least two (2) of the Competitive Practices.

*Id.* at 19.

49. The parties to the Operating Agreement agreed that the restrictive covenant was an essential requirement of forming KBS Savannah. AATU and CSTS, through Drs. Marucci, Greenwald, and Silver, would never have formed KBS Savannah without assurances from Dr.

Brown that he would not engage in a multispecialty practice during KBS Savannah's existence and for a period of time after dissolution. *See id.* at 19-20.

50. Additionally, KBS Savannah used Precision's office space and leased its medical equipment for free. KBS Savannah directly benefited from the operations that Marucci, Greenwald, and Silver built through Precision.

51. In an effort to expand the footprint of KBS Savannah, the parties to the KBS Savannah Operating Agreement opened a second location in Pooler, Georgia ("KBS Pooler").

52. Opening KBS Pooler was designed to expand the geographic reach of KBS and expand the pool of potential patients.

***Brown and Kuppinger's Anti-Competitive Behavior Destroys KBS Savannah***

53. Despite best intentions, KBS Savannah and KBS Pooler never stood a chance.

54. Unbeknownst to AATU, CSTS, Marucci, Greenwald, or Silver, two months after forming KBS Savannah, Dr. Brown and Dr. Kuppinger formed Brain Injury Solutions LLC.

55. Per the Articles of Organization, the principal office of Brain Injury Solutions was 2 Park of Commerce Blvd, Suite D, Savannah, GA 31405, which is the same principal office address as Brown's Bright Life Practice. A true and correct copy of Brain Injury Solutions' Articles of Incorporation filed with the Georgia Secretary of State is attached as Exhibit 2.

56. Dr. Kuppinger and Dr. Brown engaged in other anticompetitive behavior in violation of their contractual and fiduciary duties to KBS Savannah.

57. For example, Dr. Kuppinger created a referral schedule with a company called Meridian, where he funneled patients in the Savannah market to Dr. Brown's Bright Life practice, instead of the shared company, KBS Savannah.

58. Dr. Marucci contacted Meridian to inquire about potential contractual arrangements between Meridian and KBS Savannah in order to vet compliance. When Dr. Kuppinger found out, he immediately attacked Dr. Marucci and ordered him to cease contact because Meridian was "his contact."

59. Dr. Kuppinger also engaged in other schemes designed to bypass the operational integrity of KBS Savannah and divert opportunities to himself and Dr. Brown.

60. Despite Marucci, Greenwald, and Silver warning Dr. Brown about Dr. Kuppinger's behavior and his involvement or complicity therewith, Dr. Brown did not cease his anticompetitive and collusive acts with Kuppinger.

61. These issues and concerns about improper competition eroded the trust within KBS Savannah.

62. In February 2024, Dr. Brown and Dr. Kuppinger called a meeting for KBS Savannah's Board members, which consisted of Brown, Kuppinger, and CSTS Healthcare (which was represented by Silver).

63. Silver was unable to attend the meeting and did not even have cell phone service at the time of the board meeting.

64. At the meeting, Dr. Brown and Dr. Kuppinger voted to terminate AATU's Management Services Agreement.

65. Per Section 10.1(c) of the Operating Agreement, termination of AATU's Management Services Agreement triggered the dissolution of KBS Savannah.

66. KBS Savannah is winding up. It is no longer operating as a medical practice in Savannah or Pooler and is not seeing active patients. However, KBS Savannah remains an active

entity for the sole purpose of collecting outstanding accounts receivable and making distributions to its members and AATU per the terms of the Operating Agreement.

67. Despite the dissolution of KBS Savannah, the restrictive covenants remain enforceable.

68. Dr. Brown and Dr. Kuppinger are in violation of their non-competes.

69. According to patients and other sources, Dr. Brown's practice, Bright Life, is providing not only chiropractic services but also neurological testing.

70. Upon information and belief, Dr. Brown and Dr. Kuppinger are also working together, through Brain Injury Solutions or otherwise, to provide multi-disciplinary medical services to patients in direct violation of their non-compete agreements.

***Dr. Brown Relies on Fraudulent Contract to Avoid Contractual Obligations***

71. When KBS Savannah became aware of that Dr. Brown was violating his non-compete through Bright Life's activity, it sent a cease-and-desist letter, citing the restrictive covenants contained in Section 9.1 of the Operating Agreement. *See Ex. 1* at 19.

72. Dr. Brown, though legal counsel, responded to the cease-and-desist letter arguing that the Operating Agreement's non-compete provision included an explicit carve out for services provided by either Brain Injury Solutions LLC or Bright Life.

73. Dr. Brown, through counsel, provided a copy of the Operating Agreement he purported to be the operative agreement. A true and correct copy of the Agreement provided to KBS through Brown's counsel is attached as Exhibit 3.

74. The agreement provided by Dr. Brown is not the legally binding Operating Agreement and appears to be intentionally altered.

75. The Operating Agreement was executed via DocuSign.

76. When documents are executed via DocuSign, a Certificate of Completion is created. The Certification of Completion provides identifying information about the document, including a unique identification number called an Envelope ID, information about the sender of the document, the number of pages of the document, the signing party's IP address and timestamp of signature. The Certificate of Completion provides an audit trail summary and provides evidence of the binding nature of an executed agreement.

77. A true and correct copy of the DocuSign Certificate of Completion for the KBS Savannah Operating Agreement is attached as <u>Exhibit 4.</u>

78. The executed Operating Agreement was assigned a unique Envelope ID of FE289B95E6344A5DB7C8582AA7C4D106 and the Certificate of Completion shows that the Operating Agreement was 34 pages long.

79. The agreement provided by Brown is stamped with the same Envelope ID as the original KBS Operating Agreement and contains the same timestamps for each of the signature to the agreement.

80. However, it is not possible for two different documents to have the same Envelope ID and the same signature time stamps.

81. The agreement provided by Dr. Brown contains numerous material alterations to the terms of the Operating Agreement, as well as significant blanks spaces where it appears text was added to an existing PDF in order to maintain the Envelope ID header and signature page.

82. The agreement provided by Brown is 37 pages in length, but the Certificate of Completion notes that the document is only 34 pages in length.

83. Dr. Brown has not produced a Certificate of Complete or other evidence that the agreement he provided in response to the cease-and-desist letter and on which he relies to justify his contractual breaches is the legally binding and operative Operating Agreement.

84. The material changes to the substance and format of the document, while maintaining the Envelope ID and time stamps clearly demonstrates that Dr. Brown's agreement was intentionally and fraudulently altered.

85. Moreover, even without audit trail proof, the non-compete provision cited by Dr. Brown is inconceivable. Brain Injury Solution was not even in existence at the time the Operating Agreement was signed, so it is impossible that services provided through Brain Injury Solutions would have been contemplated as an exclusion to the restrictive covenant.

86. Per the Certificate of Incorporation filed with the Georgia Secretary of State, Brain Injury Solutions LLC was organized on December 2, 2022, by Dr. Brown and Dr. Kuppinger – nearly two months after the execution of the KBS Savannah Operating Agreement.

87. AATU and CSTS Healthcare Solutions would never have executed the Operating Agreement without assurances that Dr. Brown could not compete in a multispecialty practice. The entire point of Brown joining Precision and then subsequently KBS Savannah was to expand the services lines offered to patients and learn how to operate a multispecialty practice and in exchange he provided assurances to AATU and CSTS that he would not compete in a multispecialty practice during his time with KBS Savannah and for a period of two years after.

## COUNT I – DECLARATORY JUDGMENT
(Against Dr. Brown)

88. Plaintiffs incorporate by reference the allegations contained in the previous paragraphs as if fully set forth herein.

89. The Operating Agreement attached as Exhibit 1 is the legally binding agreement between Brown, Kuppinger, CSTS Healthcare, and AATU, as evidenced by the DocuSign Certificate of Completion and other evidence.

90. The agreement relied on by Dr. Brown is an alteration of the legally binding Operating Agreement.

91. Plaintiffs are entitled to a judgement that Exhibit 1 is the legally binding and enforceable version of the Operating Agreement and all other contracts purporting to be valid are without any legal effect.

## COUNT II - BREACH OF CONTRACT
(Against All Defendants)

92. Plaintiffs incorporate by reference the allegations contained in the previous paragraphs as if fully set forth herein.

93. By becoming a member of KBS Savannah and signing the Operating Agreement, Dr. Brown and Dr. Kuppinger agreed to a restrictive covenant that prohibits them from providing any services to, engaging in, being employed by or consulting with any business that provide two or more of the following specialties: chiropractic, interventional pain, orthopedic, orthopedic surgery, neurology and neurosurgery for a period of two years within Chatham County.

94. Dr Brown is violating his restrictive covenant by providing chiropractic and neurology services through his Bright Life Practice.

95. Upon information and belief, Dr. Brown and Dr. Kuppinger are also violating their restrictive covenants through coordinated activities and/or their jointly owned LLC, Brain Injury Solutions.

96. The restrictive covenant is an essential and material element of the KBS Savannah Operating Agreement and remains binding despite dissolution and windup of KBS Savannah.

97. Defendants' violation of the non-compete provision has and will continue to cause damage to AATU, CSTS Healthcare, Marucci, Greenwald, and Silver.

98. Plaintiffs are entitled to recover the damages caused by Defendants' contractual breach.

99. Plaintiffs are entitled to an injunction prohibits Defendants from further violating the restrictive covenants of the Operating Agreement by engaging with, being affiliated with, or providing services to a business operating more than one medical specialty list in the Operating Agreement.

## COUNT III – BREACH OF FIDUCIARY DUTY
(Against Dr. Brown)

100. Plaintiffs incorporate by reference the allegations contained in the previous paragraphs as if fully set forth herein.

101. As a member, Brown owed fiduciary duties to Precision and KBS Savannah.

102. Brown breached his fiduciary duties to Precision when he convinced Marucci, Greenwald, and Silver to restructure Precision into KBS Savannah to add Kuppinger while knowing Kuppinger intended to engage in competitive behavior with KBS Savannah.

103. The restructuring resulted in Precision providing office space and medical/office equipment to KBS Savannah without charge.

104. Brown breached his fiduciary duties to KBS Savannah by forming Brain Injury Solutions with Kuppinger for the purpose of siphoning KBS Savannah clients.

105. Brown breached his fiduciary duties to KBS Savannah by engaging in Kuppinger's scheme with Meridian to refer patients to Bright Life instead of KBS Savannah.

106. Brown breached his fiduciary duties to KBS Savannah when benefited from the training and introductions to the Personal Injury Institute when he had ever intention of using that

training and connections to later cut AATU and CSTS Healthcare out of the practice and compete with KBS Savannah.

107. Brown breached his fiduciary duties by voting to terminate AATU's Management Services Agreement so he could engage in a multispecialty medical practice outside of KBS Savannah.

108. Brwon took these actions while affirmatively understanding it would be harmful to the interests of Precision, KBS Savannah, and their respective members and affiliates.

109. Plaintiffs are entitled to damages resulting from Brown's breach of fiduciary duties in an amount to be determined at trial.

## COUNT IV - BREACH OF FIDUCIARY DUTY
(Against Dr. Kuppinger)

110. Plaintiffs incorporate by reference the allegations contained in the previous paragraphs as if fully set forth herein.

111. As a member, Dr. Kuppinger owed fiduciary duties to KBS Savannah.

112. Dr. Kuppinger breached his fiduciary duties to KBS Savannah by forming Brain Injury Solutions with Dr. Brown for the purpose of siphoning KBS Savannah clients.

113. Dr. Kuppinger breached his fiduciary duties to KBS Savannah by engaging in a scheme with Meridian to refer patients to Bright Life instead of KBS Savannah.

114. Dr. Kuppinger breached his fiduciary duties to KBS Savannah when he joined KBS Savannah with ever intention of later cutting AATU and CSTS Healthcare out of the practice and competing with KBS Savannah and its members/affiliate.

115. Dr. Kuppinger breached his fiduciary duties by voting to terminate AATU's Management Services Agreement so he could engage in a multispecialty medical practice outside of KBS Savannah.

116. Dr. Kuppinger took these actions while affirmatively understanding it would be harmful to the interests KBS Savannah, and their respective members and affiliates.

117. Plaintiffs are entitled to damages resulting from Dr. Kuppinger's breach of fiduciary duties in an amount to be determined at trial.

### COUNT V – FRAUD
(Against Dr. Brown)

118. Plaintiffs incorporate by reference the allegations contained in the previous paragraphs as if fully set forth herein.

119. Brown had made material misrepresentations to KBS Savannah, AATU, CSTS Healthcare, Marucci, Greenwald, and Silver.

120. Specifically, he represented an obviously false and altered version of the Operating Agreement to be a legally enforceable contract that permits him to engage in competitive practices in the Savannah market.

121. Upon information and belief, Brown forged and altered the Operating Agreement to pass it off as a valid contract.

122. Upon information and belief, Brown concealed the fact that he knew the agreement he presented was materially altered and forged.

123. Brown's misrepresentations were knowing and intentional.

124. As a direct and proximate cause of Brown's fraud, Plaintiffs suffer and continue to suffer damages, including compensatory damages, consequential damages, interest, costs, and attorneys' fees.

125. Plaintiffs are entitled to damages for Brown's fraud pursuant to O.C.G.A. § 51-6-1- and common law.

## COUNT VI– CIVIL CONSPIRACY
(Against All Defendants)

126. Plaintiffs incorporate by reference the allegations contained in the previous paragraphs as if fully set forth herein.

127. Drs. Brown and Kuppinger knowingly agreed, contrived, confederated, and/or conspired to injure Plaintiffs by engaging in improper competition, siphoning patients and opportunities from KBS Savannah, utilizing company resources for training and building business relationships while intending to subsequently use that confidential information, marketing, goodwill, and business relationships for his own personal gain.

128. Drs. Brown and Kuppinger conspired amongst themselves, and potentially others, when they formed Brain Injury Solutions as a competitor to KBS Savannah.

129. Drs. Brown and Kuppinger conspired amongst themselves, and potentially others when they engaged in a scheme with Meridian to funnel referrals to Bright Life instead of KBS Savannah.

130. Drs. Brown and Kuppinger conspired amongst themselves when they voted to terminate AATU's Management Services Agreement, effectively dissolving KBS Savannah and cutting Marucci, Greenwald, and Silver out of the market.

131. Upon information and belief, Brown conspired with other unknown individuals when he provided neurological testing to patients at Bright Life in contravention of his restrictive covenant.

132. As a direct and proximate cause of Defendants' overt unlawful acts, which were made pursuant to a common scheme between Drs. Brown and Kuppinger, and potentially others, Plaintiffs suffered and continue to suffer damages. Plaintiffs are entitled to recover compensatory and consequential damages, as well as interest, costs, and attorneys' fees.

## COUNT VII – PUNITIVE DAMAGES
(Against All Defendants)

133. Plaintiffs incorporate by reference the allegations contained in the previous paragraphs as if fully set forth herein.

134. Defendants acted with the specific intent to cause harm to Plaintiffs when they engaged in the unlawful and improper acts described above.

135. Defendants' actions show willful misconduct, malice, fraud, wantonness, oppression, and the entire want of care which would raise the presumption of conscious indifference to consequences.

136. Plaintiffs are entitled to an award of punitive damages in an amount to be determined at trial pursuant to O.C.G.A. § 51-12-5.1

## COUNT VIII - ATTORNEYS FEES
(Against All Defendants)

137. Plaintiffs incorporate by reference the allegations contained in the previous paragraphs as if fully set forth herein

138. As alleged above, Defendants have acted in bad faith and have caused Plaintiffs unnecessary trouble and expense.

139. Plaintiffs are entitled to an award of attorneys' fees pursuant to O.C.G.A. § 13-6-11.

140. Plaintiffs are also entitled to attorneys' fees pursuant to Section 12.10 of the Operating Agreement. *Exhibit 1* at 24.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs request judgment against Jared Brown and Jordan Kuppinger and that the Court grant the following:

    a.    For a trial by jury on all triable issues;

  b.  For an order declaring the Operating Agreement to be the true and legally binding agreement for KBS Savannah;

  c.  For injunctive relief prohibiting Dr. Brown and Dr. Kuppinger from continuing to violate their obligations under the Operating Agreement;

  d.  For an award of damages, including, but not limited to, actual, consequential, and nominal damages, in an amount to be determined at trial;

  e.  For an award of punitive damages in an amount to be determined at trial;

  f.  For an award of attorneys' fees, costs, and litigation expenses under O.C.G.A. § 13-6-11 and as otherwise allowed by law;

  g.  For prejudgment and post-judgment interest; and

  h.  Such other and further relief as this Court may deem just and proper

Date: February 14th, 2025

Respectfully submitted,

*/s/ Lauren A. Warner*
Lauren A. Warner (GA 425769)
Brittany M. Cambre (GA 350793)*
Brandi Z. Murrain (GA 167467)
Chilivis Grubman LLP
1834 Independence Square
Atlanta, GA 30338
(404) 233-4171
lwarner@cglawfirm.com
bcambre@cglawfirm.com
bmurrain@cglawfirm.com

*Attorneys for Plaintiffs*

*\*Application for admission to SDGA pending*